IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER B. JUSTICE, | ) | CASE NO. 3:10CV2775 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Christopher B. Justice ("Justice") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §1381 *et seq.* Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

Justice challenges the Commissioner's decision on two grounds. First, he argues that he is disabled because he meets the Commissioner's Listing[1] requirements for Mental Retardation. Second, he contends that the ALJ's determination that he has the Residual Functional Capacity ("RFC") to perform jobs that exist in significant numbers is not supported by substantial evidence. For the reasons stated below, Justice's arguments are faulty and the final decision of the Commissioner should be AFFIRMED.

---

[1] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P , App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

## I.  Procedural History

On January 5, 2007, Justice filed applications for DIB and SSI due to left shoulder limitations, high blood pressure, irregular heartbeat, dyslexia, and learning problems, alleging a disability onset date of December 24, 2006.  Tr. 20, 90, 98, 135, 143.  The state agency denied Justice's claims initially on May 16, 2007 (Tr. 85-86, 90-95), and upon reconsideration on September 28, 2007.  Tr. 87-88, 98-103.  On November 29, 2007, he filed a written request for a hearing (Tr. 104-05), and on October 29, 2009, a hearing was held before Administrative Law Judge K. Michael Foley (the "ALJ"). Tr. 34-83.  In a decision dated January 6, 2010, the ALJ determined that Justice was not disabled.  Tr. 20-29.  Justice requested review of this decision by the Appeals Council and on October 29, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

On December 10, 2010, Justice filed this action seeking review of the Commissioner's decision.  Doc. 1.  On April 4, 2011, Justice filed his Brief on the Merits.  Doc. 13.  On July 17, 2011, the Commissioner filed his Brief on the Merits.  Doc. 15.

## II.  Evidence

**A.      Personal and Vocational Evidence**

Justice was born on September 9, 1970 and was thirty-nine (39) years old at the time of the ALJ's decision.  Tr. 27, 38-39.  He attended high school through the tenth grade.  Tr. 27. While in school, he took some special education classes.  Tr. 39.  Justice worked in a variety of capacities in the fifteen years prior to the hearing, including as a light welder, material handler, factory laborer, equipment operator, construction laborer, factory assembler, and painter.  Tr. 27, 44-52. Justice last worked in 2008 at Goodwill, where he was responsible for collecting and

2

picking up donations.  Tr. 22, 44-47, 151.  He quit his job in the latter half of 2008.  Tr. 22, 46.

At the time of the hearing, Justice was divorced and living with his mother and son.  Tr. 53, 58.

**B.    Medical Evidence[2]**

**Dr. Dubey**.  In March 2007, Sudhir Dubey, Psy.D., a psychologist, performed a

consultative examination of Justice.  Tr. 244-252.  Justice reported anxiety, mild depression, and

being avoidant of crowds, but denied feelings of panic, anxiety attacks, feelings of doom, fear,

shortness of breath, or increased heart rate.  Tr. 248.  Dr. Dubey found Justice's speech was

coherent and logical and the speed and quality of speech was within normal limits.  Tr. 248.  His

reasoning, judgment, and insight were appropriate.  Tr. 248.  While Dr. Dubey stated that

Justice's ability to shop, make purchases and manage money was affected, he determined that

Justice's activities of daily living were managed adequately.  Tr. 248.

Dr. Dubey administered the Wechsler Adult Intelligence Scale-III ("WAIS-III") test as

part of the examination.  Tr. 245.  Justice obtained a Verbal IQ score of 70, a Performance IQ

score of 74, and a Full Scale IQ score of 69, placing him in the borderline to low range of

intellectual functioning.  Tr. 249.  Dr. Dubey also administered the Wide Range Achievement

Test-4[th] Edition (WRAT-IV) to assess Justice's reading, writing, comprehension, and

mathematical capacity.  Tr. 249.  Justice's reading, writing, comprehension, and mathematical

scores placed him between the first and third percentile.  Tr. 249.

Dr. Dubey diagnosed mild mental retardation ("MMR") and a generalized anxiety

disorder.  Tr. 250.  Dr. Dubey stated that Justice's "mental ability to relate to others, including

fellow workers and supervisors, is not impaired by his symptoms."  Tr. 250.  Dr. Dubey found

Justice was mildly impaired in his ability to understand, remember, and follow instructions, and

---

[2] Justice's brief focuses primarily on his mental health impairments.  Therefore, this Report & Recommendation shall focus on Justice's medical history as it relates to his mental health impairments.

he noted that Justice was able to understand questions and carry out simple and complex tasks. Tr. 251.  Dr. Dubey further concluded that Justice's mental ability to withstand stress and pressure associated with day-to-day work was mildly impaired, and his ability to maintain attention, concentration, persistence, and pace was also mildly impaired.  Tr. 251.  Dr. Dubey specifically noted that in a work setting, it was "quite likely" that Justice would be able to maintain attention, concentration, and pacing to complete complex tasks.  Tr. 251.

State agency psychologist Caroline Lewin, Ph.D., questioned Dr. Dubey's diagnosis of MMR and also questioned whether Justice's IQ score may have been lowered by his mild depression and anxiety.   Tr. 253, 259-77.  Dr. Dubey was asked to clarify.  In his response, Dr. Dubey affirmed his diagnosis of MMR and summarized his findings by stating, "[g]iven the available information and his overall level of function, the diagnosis of mild mental retardation does not preclude the claimant from functioning overall appropriately and adequately."  Tr. 257. Dr. Dubey did not believe Justice's IQ score was affected by his depression and anxiety.   Dr. Dubey opined that "it is likely that the impact of his symptomology, given his long standing nature, would likely be minimal in regards to impact on his scores."  Tr. 257.

**Dr. Lewin.**  On April 24, 2007, Dr. Lewin completed a Mental Residual Functional Capacity Assessment.  Tr. 259-77.  Dr. Lewin rejected  Dr. Dubey's diagnosis of mild mental retardation, believing borderline intellectual functioning to be a more appropriate diagnosis.  Tr. 261, 267.  Dr. Lewin noted that Justice had worked as a light welder and that the file "does not show spec. ed other than for a spec. reading class but does show poor grades, it appears that adaptive behavior deficits were not at MR level during developmental period or currently."  Tr. 261.  Dr. Lewin also stated that Justice's recall, upon testing, was within normal limits, that his activities of daily living were adequate, and that his primary care physician did not notice any

mental retardation.  Tr. 261.  Dr. Lewin further noted that Justice was laid off from welding, not fired for being unable to perform.  Tr. 261,

Dr. Lewin assessed Justice as having moderate restrictions in work-related functioning but no marked limitations.  Tr. 261.  She also found that Justice's long-term concentration may not be optimal, but that he could concentrate short-term.  Tr. 261.  She assessed Justice as capable of work with simple instructions in a low-stress setting and that he should be able to relate to others.  Tr. 261.  Dr. Lewin further stated that Justice might need some extra supervision on new tasks, particularly those involving written instructions.  Tr. 261.  On August 20, 2007, state agency psychologist Marianne Collins, Ph.D., affirmed Dr. Lewin's assessment.  Tr. 295.

**Dr. McIntire.**  On August 16, 2007, Justice underwent a consultative examination by state agency psychologist Don McIntire, Ph.D.  Tr. 288-292.  Dr. McIntire found Justice's speech to be clear and that he provided complete answers to all questions.  Tr. 290-291.  Dr. McIntire noted that Justice was aware of the purpose and nature of the examination and showed no signs of confusion or disorientation.  Tr. 290.  He also recorded that Justice was extremely anxious, reported having panic attacks in crowds, and seemed withdrawn.  Tr. 290.  Justice had no trouble with long-term memory and gave adequate dates and details.  Tr. 291.  Justice reported that his short term memory had worsened and that he often forgot where he put things.  Tr. 291.  Dr. McIntire noted that Justice was able to recall six digits forward and three in reverse, "suggesting that he ha[d] good attention skills and fairly good immediate memory but very poor working memory skills and poor concentration."  Tr. 291.  After some basic testing, Dr. McIntire opined that Justice's cognitive ability appeared to be within the borderline or mild mentally retarded range.  Tr. 291.  Dr. McIntire diagnosed major depression (severe without psychotic features), panic disorder with agoraphobia, social phobia, and borderline intellectual functioning.

Tr. 291.  Dr. McIntire stated that Justice's ability to work around others was severely limited, as was his ability to manage the emotional stress of everyday work-life because of his depression and social anxiety.  Tr. 292.  Dr. McIntire opined that Justice's ability to maintain concentration to perform repetitive tasks was moderately impaired.  Tr. 292.  Dr. McIntire also concluded that Justice would have severe difficulties completing complex tasks, but that his ability to follow simple instructions was unimpaired.  Tr. 292.

**Dr. Thompson.**  In September 2009, Craig Thompson, M.D., a doctor who had treated Justice for sleep apnea, high blood pressure, seizure disorder, high cholesterol, and nerves/anxiety, completed both a physical RFC assessment and a mental RFC assessment.  Tr. 156, 448-453.  Dr. Thompson found Justice to have mild to moderate limitations in social interaction, but found marked limitations in his ability to relate to the general public.  Tr. 451. Similarly, Dr. Thompson found generally moderate limitations in Justice's concentration and persistence, with a marked limitation in his ability to maintain attention and concentration for more than brief periods of time.  Tr. 452.  Dr. Thompson found mild to moderate limitations in Justice's adaptation ability.  Tr. 452-453.  Dr. Thompson stated that "[Justice's] main disability really is that he does not understand complex issues."  Tr. 448.  He also reported that Justice did not relate well in social situations.  Tr. 448.  Dr. Thompson further stated that Justice's mental capabilities are not very advanced making difficult tasks quite difficult for him and that it would be difficult for Justice to be trained due to his cognitive limitations.  Tr. 448.

C.     **Testimonial Evidence**

1.     **Justice's Testimony**

On October 29, 2009, Justice appeared with counsel and testified at the administrative hearing.  Tr. 34-83.  Justice began by recounting his work history.  Tr. 44-51.  He testified that

his most recent job was at Goodwill in 2008, where he was responsible for taking in the donations. Tr. 45. His job duties included unloading trucks and moving furniture. Tr. 46-47. Justice stated that he quit his job at Goodwill because of his concern of sun exposure. Tr. 46. Justice also worked as a heavy equipment operator at Flemings Construction, where he operated a loader. Tr. 47. He testified that he quit that job because he was out in the heat and that it "kind of messed [him] up." Tr. 47. Prior to that, Justice worked at both Buehler Construction and H & B Masonry as a construction laborer. Tr. 48. His job duties included carrying concrete blocks and mixing mud. Tr. 48. He testified that he would carry bags of mortar, which weighed sixty to seventy pounds. Tr. 49. He also testified that when he would mix mud, he would lose track of how many shovels of sand he added to the mixture. Tr. 48-49, 55.

Justice also worked as a laborer at Silverline. Tr. 49. Justice stated that he worked twelve-hour shifts and that his duties included stacking window frames. Tr. 49. He complained that he had trouble at this job because it required a lot of math and thinking. Tr. 50. In addition, Justice worked at Whirlpool on an assembly line hanging dryer parts. Tr. 50. He stated that he had trouble keeping up with the pace of the assembly line. Tr. 50. Justice also stated that he worked at While Mule as a painter. Tr. 50. He testified that he was required to lift up to one hundred pounds and stand and walk all day long. Tr. 50-51. Justice also stated that he worked as a welder. Tr. 52. However, he only worked at this job for a couple of days because he could not hold the welding wand still to weld a round circle because his hand shook so badly. Tr. 52.

After recounting his work history, Justice stated the reason he could not work was because of "his nerves," his poor blood pressure, and his mood swings. Tr. 51-52. Justice testified that despite losing forty pounds, his blood pressure was still very high. Tr. 44-45, 56, 62. He further testified that his blood pressure medication made him lightheaded. Tr. 62.

Justice stated that when he was under stress, he had chest pains, became irritable, shook, and sweat. Tr. 52. He also reported that being around large groups of people made him nervous. Tr. 54. He stated that he had crying spells when he felt depressed and that he took medication for depression. Tr. 53. In addition, Justice reported that he had a bad memory, which made it difficult for him to remember directions. Tr. 55. He testified that he had additional problems, including sleep apnea and seizures, but that his seizures were under control. Tr. 56.

Justice also testified about his daily living activities. Justice stated that he had a difficult time reading and typically asked his mother to help him read his letters and fill out his paperwork. Tr. 40-41. Although he stated he could not multiply and divide numbers, he could add and subtract. Tr. 63. He further testified that, while he tried to help, his mother and son were primarily responsible for household chores. Tr. 54, 68-69. He also noted that he can do dishes and pick up after his son. Tr. 68-69. Justice stated that his mother did most of the cooking, but he could cook hotdogs and use a microwave. Tr. 42. Justice stated that he had a driver's license and that he enjoyed taking his son to the movies and visiting with friends. Tr. 43, 54, 57, 70. He drove himself to the hearing. Tr. 63. Justice also stated that he dated "here and there." Tr. 70.

Justice testified that he could walk half a block before he would be out of breath and dizzy. Tr. 63. He stated he could stand for five to ten minutes before he needed to sit down. Tr. 64. Justice reported that bending over was bad for his blood pressure. Tr. 64. He believed he could sit down for as long as he wanted. Tr. 64. Justice testified that he could reach in all directions. Tr. 65. He testified that, when he worked at White Mule, he was able to lift one hundred pounds, but that, at the time of the hearing, he could only lift ten pounds. Tr. 65-66. He stated that he could climb a flight of stairs, but that he would be winded. Tr. 66. Justice stated

that bathing himself was often difficult because it required him to stand up, but he was able to shave, dress, and otherwise care for his personal hygiene.  Tr. 68.

### 2.    Vocational Expert's Testimony

John R. Finch, a vocational expert ("VE"), also testified at the hearing.  Tr. 71.  The VE noted that Justice worked as a material handler (heavy exertional level and semi-skilled), a factory laborer (heavy exertional level and semi-skilled), an equipment operator (medium exertional level and semi-skilled), construction laborer (very heavy exertional level and unskilled), factory assembler (light/medium exertional levels and unskilled), and painter (medium exertional level and semi-skilled).  Tr. 72.

In a hypothetical, the ALJ asked the VE whether a person could perform any of Justice's past jobs if the individual had the same vocational factors as Justice and the following limitations: could occasionally lift and carry up to fifty pounds and frequently lift and carry up to twenty-five pounds; could sit, stand and walk for about six hours each in an eight-hour workday; and who was limited from reaching in all directions with his left arm to frequently, as opposed to continuously, with no other exertional limitations.  Tr. 72-73.  The ALJ asked the VE to further assume that the individual could cope with simple instructions in a low-stress setting; could relate to others; could concentrate on a short-term basis; and might occasionally need extra supervision on new tasks, particularly if the instructions were written rather than oral.  Tr. 73. The VE concluded that such a person would not be able to perform Justice's past work.  Tr. 73. The ALJ then asked the VE whether there were any other jobs the individual could perform.  Tr. 74.  The VE concluded that the individual would be able to perform the following unskilled jobs at the light exertional level:  assembler (44,000 jobs in Ohio, 2,500 jobs in the region), hand

packer (49,000 jobs in Ohio, 2,000 jobs in the region), and bench inspector (30,000 jobs in Ohio, 1,600 jobs in the region).  Tr. 74.

In his next hypothetical, the ALJ asked the VE to consider an individual with the following limitations: could stand for a total of four hours; could walk for a total of four hours (walking would be an hour at a time), could sit for eight hours total (sitting would be two hours at a time); could occasionally lift and carry up to twenty pounds; could use both of his hands for simple grasping, push and pulling, and fine manipulation; could not use his feet for repetitive movements such as operation of foot controls; could occasionally bend and climb steps, never squat, crawl or climb ladders; could reach above shoulder level; and would be likely to deteriorate in a stressful situation associated with a job to the extent that he doesn't do well in any social/work situations due to social anxiety.  Tr. 75.  The VE responded that such an individual would not be able to perform Justice's past work, but that there were a number of unskilled, sedentary jobs the person could perform.  Tr. 75.  Examples of these jobs included order clerk (11,000 jobs in Ohio, 400 jobs in the region) and bench assembler (44,000 jobs in Ohio, 400 jobs in the region).  Tr. 75-76.

The ALJ next asked the VE if, assuming all of Justice's testimony at the hearing was true, Justice could return to any of his past work or perform any other work.  Tr. 76.  The VE responded that the testimony regarding Justice's difficulties in concentration, focus, and following directions, and his inability to read instructions, would preclude employment.  Tr. 76.

Justice's counsel was then given an opportunity to question the VE.  Tr. 76.  Counsel asked the VE if a person would be precluded from work if he was unable to maintain attention and concentration between twenty-five and fifty percent of the day.  Tr. 77-78.  The VE

concluded that an individual who was off task between twenty-five percent of the day would not be able to work.  Tr. 78.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

In his January 2010 decision, the ALJ found that Justice had not engaged in substantial gainful activity since December 24, 2006, the alleged onset date of disability.  Tr. 22.  The ALJ determined that Justice had the following severe impairments: hypertension, left rotator cuff syndrome, obesity, sleep apnea (with related tonsillectomy and uvulopalatopharyngoplasty), a seizure disorder, affective and anxiety-related disorders, and mild mental retardation/borderline intellectual functioning.  Tr. 22.  The ALJ found that Justice did not have an impairment or combination of impairments that met or medically equaled an impairment described in the Listing of Impairments (20 C.F.R. pt. 404, Subpt. P , App. 1).  Tr. 23.

The ALJ next determined that Justice retained the RFC to perform light work, subject to no more than frequent reaching with his left upper extremity (i.e., no constant or repetitive reaching); and limited to work with simple instructions in a low stress setting generally requiring only short-term concentration; and allowing for extra supervision on new tasks, particularly where instructions were written rather than oral.  Tr. 25.  The ALJ then determined that Justice could not perform any past relevant work.  Tr. 27.  Finally, considering Justice's vocational factions, RFC, and the testimony of the VE, the ALJ found that Justice was capable of

12

performing other work that existed in significant numbers in the national economy.  Tr. 28.

Thus, the ALJ concluded that Justice was not disabled.  Tr. 28.

## V.  Arguments of the Parties

Justice makes two arguments.  First, he contends that he meets Subpart C of Listing 12.05, Mental Retardation, because "both elements [of that Subpart] are fulfilled" based on his Full Scale IQ score of 69 and his physical and mental impairments recognized by the ALJ.  Doc. 13, pp. 7-17.  Second, he argues that the ALJ's finding that he has the RFC to perform jobs that exist in significant number in the national economy is not supported by substantial evidence because the ALJ did not explain appropriately his failure to incorporate the mental impairments opinion of Justice's treating physician in the hypothetical question the ALJ posed to the VE.  Doc. 13, pp. 17-18.

In response to Justice's first argument, the Commissioner does not dispute that Justice meets the two requirements of Subpart C of Listing 12.05.  However, the Commissioner asserts that substantial evidence supports the conclusion that Justice does not satisfy the additional requirements of "the diagnostic description for mental retardation," which is found in the opening paragraph of Listing 12.05 and which requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning."  Doc. 15, p. 10.  In response to Justice's second argument, the Commissioner points out that the ALJ appropriately explained that he did not incorporate the mental impairment portion of Justice's treating physician's opinion in his hypothetical because the treating physician was not a mental health professional.  Doc. 15, p. 15.

13

## VI.  Law & Analysis

A reviewing court must affirm the findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**     **Substantial Evidence Supports the ALJ's Determination the Justice does not Meet Listing 12.05 for Mental Retardation**

In order to establish disability under the listings, a claimant must demonstrate that he had medical conditions which met, or were equal in severity to, each and every element of a listed impairment.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885; 107 L. Ed. 2d 967 (1990).  Listing 12.05 for mental retardation provides, in relevant part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; i.e. the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * *

14

> C.      A valid verbal, performance, or full scale IQ of 60 through 70 and
> a physical or other mental impairment imposing an additional and
> significant work-related limitation of function; . . . .

20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.05.

Justice argues, "Listing 12.05C only has two elements: a valid IQ score of 70 or below, and an additional severe impairment."  He complains that the ALJ improperly added elements to the analysis under Listing Subpart 12.05C.  Doc. 13, p. 15.  This argument is erroneous.  To qualify as disabled under Listing 12.05, a claimant needs to satisfy both the diagnostic description in the introductory paragraph of the Listing and one of the four sets of criteria found in Subparts A through D.  *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001).

The ALJ conducted a review of Justice's mental impairments and provided a detailed explanation of the reasons why Justice's mental impairments were not compliant with Listing 12.05.  Tr. 23-25.  Specifically, the ALJ concluded that, based on Justice's work history, activities of daily living, and the medical opinion evidence, Justice did not have deficits in adaptive functioning as required by the opening paragraph of Listing 12.05. [3]  This was the proper analysis under Listing 12.05.  *See Daniels v. Commissioner*, 70 Fed. Appx. 868, 872 (6th Cir. 2003); *Burrell v. Comm'r of Social Security*, 2000 U.S. App. LEXIS 33161, *5 (6th Cir. 2000) (unpublished table decision) (per curiam) ("Receiving benefits under Listing 12.05 also requires a deficit in adaptive functioning.") (internal quotation marks omitted).

Substantial evidence exists to support the ALJ's conclusion that Justice did not have deficits in adaptive functioning that arose before age 22.  The ALJ discussed Justice's earnings records, which show that Justice had a lengthy work history performing both semi-skilled and

---

[3]  "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. ("DSM-IV-TR") (2000), p. 42.  Adaptive functioning includes the claimant's "effectiveness in areas such as social skills, communication, and daily living skills."  *West v. Comm'r Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993)).

unskilled jobs.  Justice worked at White Mule from 1992 to 1997 as a painter, at Whirlpool from 1997-1998 on an assembly line, at Silverline from 1998 to 1999 as a material laborer, at H&B Masonry from 2000 to 2001 as a construction laborer, at Buhler Construction from 2002 to 2004 as a construction laborer, at Flemings Construction from 2006 to 2006 as a heavy equipment operator, and at Goodwill from 2007 to 2008.  Tr. 174.  Further, as late as 2007, Justice received unemployment insurance benefits, which are conditioned on the ability to be ready and willing to work.  Tr. 24, 220.  Justice's ability to hold semi-skilled employment as an adult, as well as other unskilled employment, demonstrates that he had the skill to perform relatively complicated tasks after the developmental period, which is wholly inconsistent with having deficits in adaptive functioning that manifested during the developmental period.

Justice's daily activities also support the conclusion that he did not meet the "deficits in adaptive function" requirement.  Justice testified that he could do dishes, pick up after his son, cook simple meals such as hotdogs, and use a microwave.  Tr. 23-24, 42.  Justice also reported that he lived on his own for one year after his divorce from his wife.  Tr. 288.  In addition, Justice had a driver's license, could drive a car, went out to movies with his son, occasionally dated, met with friends, and could adequately manage most of his daily activities.  Tr. 23-24. Justice also reported that he enjoyed working on cars and did so up to four days a week, but that he is now too impatient to work on cars.  Tr. 248, 250, 290.  In addition, Justice testified that he drove to the administrative hearing by himself.  Tr. 63.  All of these activities are inconsistent with the lack of adaptive functioning necessary to find mental retardation.  *See West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing ability to pay bills, shop for groceries, interact with friends and family, and engage in other daily activities as inconsistent with deficits in adaptive functioning).

Further, the medical evidence in this case supports the ALJ's conclusion that Justice's deficits in adaptive functioning did not rise to the level required by Listing 12.05.   For example, even though Dr. Dubey diagnosed mild mental retardation, his report indicated that Justice's adaptive deficits were not at a disabling level.  Tr. 244-52.  Dr. Dubey found Justice's speech to be coherent and logical; his reasoning, judgment, and insight were appropriate; and his activities of daily living were managed adequately.  Tr. 248.  Dr. Dubey also stated that Justice's "mental ability to relate to others, including fellow workers and supervisors, is not impaired by his symptoms."  Tr. 250.  Further, Dr. Dubey found Justice was only mildly impaired in his ability to understand, remember, and follow instructions and he noted that Justice was able to understand questions and carry out both simple and complex tasks.  Tr. 251.  Likewise, Dr. Dubey opined that Justice's mental ability to withstand stress and pressure associated with day-to-day work and his ability to maintain concentration, persistence, or pace were judged to be only mildly impaired.  Tr. 251.  And, in response to the state agency's request for clarification, Dr. Dubey explained that his diagnosis of mild mental retardation "does not preclude the claimant from functioning overall appropriately and adequately."  Tr. 257.  This evidence supports a finding that Justice did not have the requisite deficits of adaptive functioning required by Listing 12.05.

Dr. Lewin's mental health assessments also support the ALJ's decision.  Dr. Lewin diagnosed borderline intellectual functioning and assessed Justice as capable of work with simple instructions in a low-stress setting.  Tr. 261.  Dr. Lewin found Justice had only moderate limitations in activities of daily living and the ability to maintain concentration, persistence, or pace.  Tr. 273.  She also noted only mild limitations in maintaining social functioning and no episodes of decompensation.  Tr. 273.  She found that Justice had no marked limitations in functioning.  Tr. 261.  Furthermore, contrary to Justice's argument that Dr. Lewin offered no

evidence to support her conclusion (Doc. 13, pp. 12-13), Dr. Lewin reasonably explained that Justice's work history, activities of daily living, and medical history all evidenced that his adaptive behavior deficits were not at the mental retardation level.  Tr. 261.  Dr. Lewin also specifically noted that Justice had been diagnosed with a generalized anxiety disorder (Tr. 261, 263), and reasonably summarized the evidence pertaining to Justice's mental limitations and abilities.  Tr. 261.  This evidence further supports the ALJ's decision that Justice did not have deficits in adaptive functioning as required by Listing 12.05.

Justice argues at length that the opinions of Dr. Dubey and Dr. McIntire support a finding that he met the requirements of Listing 12.05.  However, even assuming that this is true, it is also true that substantial evidence supports the ALJ's finding that Justice did not have deficits in adaptive functioning and therefore did not meet Listing 12.05.  Based on the applicable standard of review set forth above, substantial evidence supports the ALJ's decision and it should be affirmed.

**B.    The ALJ'S Determination that Justice Could Perform a Significant Number of Jobs in the National Economy is Supported by Substantial Evidence**

Justice's second argument is that the ALJ's determination under Step Five that he could perform a significant number of jobs in the national economy is not supported by substantial evidence because the ALJ elicited flawed testimony from the VE at the administrative hearing. Specifically, Justice contends that the ALJ erred in failing to include the mental limitations found by Dr. Thompson, his treating physician, in the hypothetical question to the VE that incorporated the physical limitations found by Dr. Thompson.  Doc. 13, pp. 17-18.

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.  *Ealy v. Comm'r*

*of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010).  However, it is well settled that

hypothetical questions need only incorporate those limitations that the ALJ has accepted as

credible.  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993);

*Infantado v. Astrue*, 263 Fed. Appx. 469, 477 (6th Cir. 2008).

      In this case, Dr. Thompson prepared both a physical RFC assessment and a mental RFC

assessment for the state agency.  Tr. 449-53.  In the hypothetical question to the VE, the ALJ

included the physical limitations found by Dr. Thompson but excluded the mental limitations.

Tr. 74-75.  In refusing to incorporate the mental limitations, the ALJ explained that he had

trouble with the methodology of Dr. Thompson's mental RFC assessment.  Tr. 75.  The ALJ was

under no obligation to include limitations that he found unreliable.  Thus, the ALJ's hypothetical

question, which was based on only those limitations that he found credible, was proper.

      Justice also asserts that the ALJ did not provide any reason for rejecting Dr. Thompson's

mental RFC assessment and that this constitutes a reversible error.  To the contrary, the ALJ did

provide a reason for rejecting Dr. Thompson's mental RFC assessment in his decision.  Tr. 26.

Consistent with his concerns at the hearing about Dr. Thompson's mental RFC assessment, the

ALJ specifically stated in his decision that he did not credit Dr. Thompson's mental RFC

assessment because he "is not a mental health professional and does not possess the specific

knowledge to evaluate such functioning."  Tr. 26.

      Generally, an ALJ must give the opinion of a treating source controlling weight if he

finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic

techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v.*

*Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)  "If an ALJ decides to give a treating

source's opinion less than controlling weight, he must give "good reasons" for doing so that are

sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion, and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ did not err in giving no weight to Dr. Thompson's mental RFC assessment. First, Dr. Thompson's mental RFC assessment is not entitled to controlling weight or special significance because an RFC finding is not a medical opinion, but an administrative determination reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2); *Figueroa v. Comm'r of Soc. Sec.*, Case No. 1:09CV2793, 2011 U.S. Dist. LEXIS 14057, at *25 (N.D. Ohio Jan. 27, 2011) (claimant's RFC finding is an administrative determination reserved for Commissioner); *see also Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2011) (finding opinion by a physician on an issue reserved for Commissioner is not entitled to controlling weight or special significance).

Second, the ALJ's explanation for not assigning any weight to the mental RFC assessment of Dr. Thompson satisfies the good reason requirement of the treating physician rule. The ALJ gave Dr. Thompson's mental RFC assessment no weight because he "is not a mental health professional and does not possess the specific knowledge to evaluate such functioning." Tr. 26. Justice does not dispute that Dr. Thompson is not a mental health expert. *See* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). The ALJ assigned controlling weight to the mental health assessment of Dr. Lewin, a mental health professional, who opined that Justice is limited to simple instructions in a low

stress setting generally requiring only short-term concentration.  Tr. 26.  In doing so, the ALJ

determined Dr. Lewin's assessments were more consistent with the longitudinal record in this

case.  Tr. 26.  In sum, the ALJ provided a good explanation for not assigning any weight to Dr.

Thompson's mental RFC assessment and did not violate the treating physician rule.

        Based on the foregoing, the ALJ's failure to incorporate the mental limitations found by

Dr. Thompson in his mental RFC assessment into the hypothetical question was not in error.

Accordingly, the ALJ's determination that Justice could perform a significant number of jobs in

the national economy under step five is supported by substantial evidence.

### VII.  Conclusion and Recommendation

        For the foregoing reasons, the final decision of the Commissioner denying Plaintiff

Christopher B. Justice's applications for DIB and SSI should be AFFIRMED.


 Dated: November 4, 2011

                                                _____
                                                Kathleen B. Burke
                                                United States Magistrate Judge




### OBJECTIONS

        Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).